909 P.2d 466

**STATE of Arizona, Appellee,**

v.

**David Eugene McANULTY, Appellant.**

**No. 1 CA–CR 94–0533.**

Court of Appeals of Arizona,
Division 1, Department E.

Sept. 14, 1995.

Review Denied Jan. 17, 1996.*

---

** The Honorable Melvyn T. Shelley, retired judge of the Arizona Court or Appeals, was authorized to participate in the disposition of this matter by the Chief Justice of the Arizona Supreme Court pursuant to the Arizona Constitution, Article 6, section 20, and A.R.S. section 38–813 (1985).

* Corcoran, J., of the Supreme Court, did not participate in the determination of this matter.

**400**

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Division, and Diane M. Ramsey, Assistant Attorney General, Phoenix, for appellee.

John C. Williams, Prescott, for appellant.

## OPINION

GERBER, Judge.

David Eugene McAnulty (McAnulty) appeals his convictions and sentences for one count of child molestation and two counts of sexual abuse. For reasons that follow, we affirm.

## BACKGROUND

McAnulty was charged with committing four offenses against his former girlfriend's three granddaughters: H.B., K.B., and T.S. H.B. testified that when she was seven, McAnulty rubbed her vagina and her buttocks. This incident occurred when she was left alone with him because she was too sick to attend school. She also testified that, on other occasions, he rubbed his "private part" against her when she sat on his lap.

K.B., H.B.'s older sister, testified that McAnulty assaulted her more than one dozen times when she was between seven and nine years of age. She related that, while they were together at her grandmother's home, he touched her vagina and her breasts with "his hand and his private part."

T.S., the sisters' first cousin, testified that McAnulty molested her when she was five or six years old by rubbing his "private" against her vaginal area.

McAnulty also was charged with committing one count of sexual abuse against his niece, J.M. According to J.M., the incident occurred when she was alone with McAnulty inside a trailer parked near her parent's home. J.M. said that, as she turned to leave the trailer, he reached around her from behind, placed his hand inside her shirt, and squeezed her breast.

The state also introduced testimony from two other nieces of McAnulty, R.K. and V.M., regarding uncharged sexual acts that occurred approximately eight to ten years prior to the first of the charged offenses. R.K. testified that when she was twelve, McAnulty touched her breasts and tried to undo her bra as they were driving together in a van. V.M., R.K.'s sister, testified that when she was fourteen, McAnulty took her hand and placed it on his penis. She related that about one week later, he grabbed her breast and rubbed his penis against her buttocks. She also recounted two subsequent incidents in which he touched her breast and vagina and she touched his penis. Finally, she testified that when she was fifteen or sixteen, she engaged in intercourse with him.

McAnulty testified in his own defense. He denied assaulting H.B., K.B., and T.S. He admitted that he touched his niece J.M.'s breast, but indicated that he did so accidentally. During cross-examination, he invoked his Fifth Amendment privilege and refused to answer questions about incidents involving R.K. and V.M.

The jury found McAnulty guilty of one count of child molestation involving H.B., a class 2 felony and dangerous crime against

children, in violation of Arizona Revised Statutes Annotated (A.R.S.) section 13–1410; one count of sexual abuse involving K.B., a class 3 felony and dangerous crime against children, in violation of A.R.S. section 13–1404; and one count of sexual abuse involving his niece, J.M., a class 5 felony, in violation of A.R.S. section 13–1404.[1] The jury acquitted him of molestation charges involving K.B. and her cousin, T.S. The trial court sentenced him to consecutive, mitigated prison terms of twelve years on the child molestation offense and five years on the sexual abuse offense involving K.B. It imposed a term of three years unsupervised probation on the sexual abuse offense involving J.M., to be served upon his release from imprisonment.

McAnulty filed a timely notice of appeal. He contends that the trial court erred:

1. In admitting evidence of uncharged sexual misconduct alleged by R.K. and V.M.;

2. In requiring him to assert his Fifth Amendment privilege before the jury during cross-examination; and

3. By coercing the jury into returning a guilty verdict.

## DISCUSSION

### EVIDENCE OF UNCHARGED MISCONDUCT

Because the state sought to introduce evidence of uncharged sexual conduct that occurred as long as ten years prior to the charged offenses, it was required to present qualified expert testimony that the prior acts showed a "continuing emotional propensity" toward sexually aberrant behavior pursuant to *State v. Treadaway*, 116 Ariz. 163, 167, 568 P.2d 1061, 1065 (1977) (requiring expert testimony to establish that prior sexual offenses remote in time or different in nature from

the charged offense are relevant to show the defendant's continuing sexually aberrant propensities). The parties stipulated that the trial judge could make this propensity determination based upon the written report of Steven R. Gray, Ed.D. (Dr. Gray). In his report, Dr. Gray concluded that incidents involving R.K and V.M. evidenced "a continuing emotional propensity to commit sexually aberrant acts." Accordingly, the trial judge admitted R.K.'s and V.M.'s testimony.

On appeal, McAnulty challenges Dr. Gray's qualifications to render an opinion on emotional propensity. We find that McAnulty has waived this issue by not raising it below. *State v. Salazar*, 181 Ariz. 87, 89 n. 1, 887 P.2d 617, 619 n. 1 (App.1994). In any event, the record shows that Dr. Gray was a licensed psychologist and therefore was qualified to render such an opinion. *State v. Varela*, 178 Ariz. 319, 322, 873 P.2d 657, 660 (App.1993).

McAnulty also asserts that the incidents involving R.K. and V.M. were inadmissible because they were too "remote." He relies exclusively on *Salazar*, in which this court reversed a conviction for attempted child molestation due to the trial court's wholesale admission of evidence of three sexual assaults that preceded the charged offense by as many as twenty-one years. 181 Ariz. at 89, 887 P.2d at 619. In order to satisfy the *Treadaway* requirement, the trial court in *Salazar* relied on the opinion of Robert Emerick (Emerick), then director of the Phoenix Memorial Hospital Sexuality and Addiction Program, that the defendant's prior acts demonstrated a continuing emotional propensity to engage in sexually aberrant behavior.[2] *Id.* Notwithstanding the trial court's attempt to satisfy *Treadaway*, this court held that the trial court abused its discretion under Rule 403, Arizona Rules of Evidence, by admitting evidence of two of the assaults

---

1. J.M. testified that the offense occurred in July 1992 when she was fourteen years old. At that time, sexual abuse was classified as a dangerous crime against children only if the victim was under fourteen. *See* Historical and Statutory Notes, A.R.S. § 13–1404 (Supp.1994).

2. Prior to the *Salazar* decision, this court determined that Emerick was not qualified to present

expert medical testimony because he was not licensed or certified in either the medical or mental health areas. *Varela*, 178 Ariz. at 322, 873 P.2d at 660. The defendant in *Salazar*, however, failed to preserve the issue of Emerick's qualifications for appeal. *Salazar*, 181 Ariz. at 89 n. 1, 887 P.2d at 619 n. 1.

without taking steps to eliminate inflammatory details that served only to prejudice the defendant. *Id.* at 92, 887 P.2d at 622. This court found that evidence of a third incident was wholly inadmissible under Rule 403 because that incident was temporally remote and "vastly dissimilar" to the charged offense. *Id.*

■ We find no such abuse of discretion in this case. V.M. and R.K. testified about conduct that was similar to the charged offenses: McAnulty's touching of the victims' breasts and genitalia while the victims were alone with him. In *Salazar*, this court noted that evidence suggesting a similarity between the charged and uncharged conduct did not offend Rule 403. *Id.* at 92 n. 5, 887 P.2d at 622 n. 5.

In the present case, the trial judge indicated that he was concerned about V.M.'s testimony regarding sexual intercourse with McAnulty. In admitting the testimony, the judge apparently accepted the state's explanation that the incident was the culmination of McAnulty's "grooming" of V.M. during her adolescence and therefore helped explain his sexual motivation regarding the charged offenses. At trial, V.M. testified only to the fact of intercourse but, unlike the witness in *Salazar*, the state did not "luxuriate in inflammatory detail." *Id.* at 92, 887 P.2d at 622. Accordingly, we find that the challenged propensity evidence was properly admitted under the requirements of both *Treadaway* and *Salazar*.

### INVOCATION OF FIFTH AMENDMENT

During trial, defense counsel informed the trial judge that McAnulty would assert his Fifth Amendment privilege in response to questions about incidents involving V.M. and R.K. The judge ruled that such invocation would take place in open court before the jury. McAnulty did not testify about the incidents involving V.M. and R.K. during direct examination. When the prosecutor asked questions about V.M. and R.K. during cross-examination, he asserted his privilege seven times.

McAnulty acknowledges that, by taking the witness stand, he waived his Fifth Amendment privilege and was subject to cross-examination "to the same extent and subject to the same rules as any other witness." *State ex rel. McDougall v. Corcoran,* 153 Ariz. 157, 160, 735 P.2d 767, 770 (1987); A.R.S. § 13–117(A) (1989).[3] He also acknowledges that the state's cross-examination may extend to instances of uncharged misconduct, as long as those instances are otherwise admissible at trial. *See United States v. Cuozzo,* 962 F.2d 945, 948 (9th Cir.), *cert. denied,* 506 U.S. 978, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992); *United States v. Beechum,* 582 F.2d 898, 907 (5th Cir.1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). However, he argues that the trial court erred by requiring him to assert the privilege in front of the jury in response to the prosecutor's questions.

McAnulty's argument suggests an analogy to Arizona cases that consider whether the state or defendant may call a witness who has indicated an intention to assert the Fifth Amendment. *See State v. Corrales,* 138 Ariz. 583, 676 P.2d 615 (1983) (whether to permit the state to call a witness who has indicated he will refuse to testify is within trial court's discretion); *see also State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983) (defendant is not denied Sixth Amendment right to compulsory process when trial judge with "extensive knowledge of the case" precludes defense witness who can legitimately invoke Fifth Amendment). However, the analogy is not persuasive when applied to a testifying defendant. In *United States v. Hearst,* the Ninth Circuit explained:

> [W]hen a defendant has voluntarily waived his Fifth Amendment privilege by testifying in his own behalf, the rationale for prohibiting privilege-invoking queries on cross-examination does not apply. The defendant has chosen to make an issue of his credibility; he has elected to take his case

---

3. This provision states:

A defendant in a criminal action or proceeding shall not be compelled to be a witness against himself, but may be a witness in his own behalf. If he offers himself as a witness in his own behalf, he may be cross-examined to the same extent and subject to the same rules as any other witness.

to the jury in the most direct fashion. The government, accordingly, has a right to challenge the defendant's story on cross-examination. *Brown v. United States, supra*, 356 U.S. [148] at 154–56, 78 S.Ct. 622 [ (1958) ]. The government may impeach the defendant by developing inconsistencies in his testimony; the government may also successfully impeach him by asking questions he refuses to answer. If the refusals could not be put before the jury, the defendant would have the unusual and grossly unfair ability to insulate himself from challenges merely by declining to answer embarrassing questions. He alone could control the presentation of evidence to the jury.

Our view finds support in decisions construing the propriety of judicial and prosecutorial comment upon a defendant's refusal to testify. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), held that neither the government nor the court may comment on an accused's exercise of his Fifth Amendment privilege by refusing to testify. But it has long been established that comment is allowed when a defendant fails to explain evidence against him after first waiving his privilege by taking the witness stand. *Caminetti v. United States*, 242 U.S. 470, 492–95, 37 S.Ct. 192, 197–98, 61 L.Ed. 442 (1917). Since the offering of questions designed to elicit invocation of the Fifth Amendment is really only a form of comment on the defendant's failure to testify, intended to present to the jury the government's interpretation of his credibility, we believe that the rule of *Caminetti* should apply to the present case.

563 F.2d 1331, 1341–42 (9th Cir.1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978) (footnote omitted); accord *Beechum*, 582 F.2d at 908–909; *United States v. Hernandez*, 646 F.2d 970, 979 (5th Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981).

■ By seeking to gain the benefit of presenting his case directly to the jury, McAnulty exposed himself to the risk of having to invoke his Fifth Amendment privilege in front of it. He could have avoided this risk by choosing not to testify at all. We find no error in the trial court's ruling that he invoke his privilege in front of the jury.

Relying on A.R.S. section 13–117(A), McAnulty argues that requiring him to assert the Fifth Amendment in front of the jury was error because he was not treated like "any other witness" who declared an intention to refuse to testify. We disagree.

As previously noted, a trial judge may require a witness to assert the privilege before the jury. *Corrales*, 138 Ariz. at 588, 676 P.2d at 620; *McDaniel*, 136 Ariz. at 194, 665 P.2d at 76. In fact, if the trial judge had precluded McAnulty's testimony entirely, he may have infringed upon McAnulty's constitutional right to testify in his own defense. *See Rock v. Arkansas*, 483 U.S. 44, 49, 107 S.Ct. 2704, 2707–08, 97 L.Ed.2d 37 (1987) (recognizing existence of such a right).

■ McAnulty also relies on *State v. Dunlap*, 125 Ariz. 104, 608 P.2d 41 (1980), to support his claim of error. His reliance, however, is misplaced. In *Dunlap*, our supreme court held that the defendant's Sixth Amendment right of confrontation was violated when a witness called by the state asserted the Fifth Amendment in response to questions posed on cross-examination. Although the supreme court noted that striking a witness's testimony may be appropriate when cross-examination is unreasonably limited, the court did not set out a rule requiring that remedy whenever a questioner is met with an invocation of the Fifth Amendment. *Id.* at 105, 608 P.2d at 42. As previously noted, asking a testifying defendant relevant questions that induce the assertion of the privilege is permissible as a form of comment on the defendant's credibility. *Hearst*, 563 F.2d at 1342.

*Longoria v. State*, 99 Nev. 754, 670 P.2d 939 (1983), relied on by McAnulty, does not suggest a different result. In that case, a defendant charged with murder asserted the Fifth Amendment when cross-examined about a stabbing that occurred one month before the murder. *Id.* 670 P.2d at 939–40. The Nevada Supreme Court reversed the defendant's conviction on the ground that the prior incident was not relevant to the

charged offense. *Id.* 670 P.2d at 940–41. In contrast, the prosecutor in the present case properly questioned McAnulty about incidents involving V.M. and R.K. because these incidents were probative of his continuing emotional propensity toward sexually aberrant behavior.

### COERCION OF JURY VERDICT

Following closing arguments on May 5, 1994, the jurors retired and deliberated for one hour and forty-five minutes before recessing for the evening. The following day, after deliberating until late afternoon, they submitted a note asking, "What happens if jurors cannot agree on one count out of five, count three?" That count charged McAnulty with molesting H.B. With the agreement of defense counsel, the trial judge asked the jurors if they had verdicts on the other counts and whether "more time would help" them reach a verdict on the unresolved count.

In open court, the jury foreman announced that the jurors had reached verdicts on all counts except Count III. The judge then asked the foreman:

THE COURT: Do you think, and I'll just address this to you, and then I'll ask the others if they agree, that there's a reasonable probability that by spending more time the jury—a little bit more time, a reasonable time, the jury could reach a verdict on count three?

THE FOREMAN: I really cannot give you an answer to that, because I really don't know.

THE COURT: Let me ask for a show of hands. Now, you folks have been together since 9:00 o'clock this morning, that's over seven hours, and two hours yesterday, and I'm aware of that, and before I attempt to answer your question I want to simply ask all the jurors if you feel that within a reasonable time, let's say another hour or something, half hour to an hour, that you could reach a verdict on this final count. Those of you who think that you can in a relatively short period of time reach a verdict hold up your hands.

Three of the twelve jurors responded affirmatively. The judge then answered the jurors' question by explaining that he would enter judgment on the counts for which they had returned verdicts and would declare a mistrial as to the other count. He then sent the jurors back to the jury room, explaining as follows:

[I]'m going to send you folks back into the jury room for a short period of time so that you can discuss the answer to the question and anything else that you need to discuss regarding count three, or whatever else you want to talk about, and then we'll gather again shortly, either at your request or certainly no later than about 10 or 15 minutes from now.

Less than twenty minutes later, the jurors returned to the courtroom with verdicts on all counts.

Based on the foregoing exchange, McAnulty asserts that the trial judge "coerced" a guilty verdict on Count III because he "gave the jury no more than ten to fifteen minutes to come up with a verdict or a mistrial would be declared." Although defense counsel did not object to the judge's instructions, that fact is immaterial since fundamental error is present "whenever a judge improperly influences or coerces a verdict." *State v. Lautzenheiser*, 180 Ariz. 7, 10, 881 P.2d 339, 342 (1994).

We are required to consider the "totality of the circumstances" in assessing whether McAnulty "received a fair trial at the hands of an independent jury, the members of which were free from intimidation or undue pressure." *Id.* at 9, 881 P.2d at 341. Applying this standard, we find no coercion in the remarks at issue. The trial judge placed no time limit on deliberations. When the judge sent the jurors back to the jury room following the 4:15 p.m. exchange in the courtroom, he merely instructed them to return shortly to report on their progress. The judge had followed a similar procedure on the first day of deliberations, meeting with jurors at 5:00 o'clock to determine if they wished to continue deliberations or to return the next day. Thus, it was unlikely that the jury believed it had only ten to fifteen minutes to reach a verdict before a mistrial was declared. Moreover, in light of

the exchange in the courtroom, quoted above, the jurors would have had reason to believe that, if they remained undecided, the judge would inquire whether further deliberation would be helpful. Such knowledge could have dispelled, rather than enhanced, pressure to convict.

The remarks at issue in this case lack the elements of coercion found in *Lautzenheiser*, on which McAnulty exclusively relies. In *Lautzenheiser*, polling of the jury revealed a lone holdout against conviction, thereby increasing the pressure on that juror when further deliberations were ordered. 180 Ariz. at 10, 881 P.2d at 342. In contrast, the trial judge in the present case studiously avoided any inquiry that would have identified a numerical division. Moreover, in *Lautzenheiser*, the judge ordered further deliberations despite the foreman's opinion that they would be fruitless. *Id.* at 9, 881 P.2d at 341. Here, although the foreman did not know whether further deliberations would help, three other jurors indicated that they would. Finally, the timing of the deliberations in *Lautzenheiser*—the afternoon of New Year's Eve—likely increased the urgency to reach a verdict. *Id.* No such pressure existed in this case.

### CONCLUSION

None of the issues raised by McAnulty warrants reversal of his convictions. Pursuant to A.R.S. section 13–4035, we have reviewed the entire record on appeal. We find no fundamental error. McAnulty's convictions and sentences are affirmed.

CONTRERAS, P.J., and LANKFORD, J., concur.